FILED

APR 17 2007

CLERK
United States Bankruptcy Court
San Jose, California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 04-54764-ASW |
| Casey & Barbara Young, | Chapter 13 |
| Debtors. | |

MEMORANDUM DECISION
REGARDING STANDARD FOR VALUATION OF CREDITOR'S CLAIM

Before the Court is the Debtors' *Motion to Modify Chapter 13 Plan* ("Motion"). The Debtors, Casey and Barbara Young ("Debtors"), filed their original Chapter 13 plan ("Plan") on July 30, 2004. The Plan was confirmed without objection on September 24, 2004.

Debtors filed the instant Motion on October 5, 2005. Having received no objection, Debtors filed a request for entry of default on October 26, 2005. On October 27, 2005, Creditor CIT Group/Sales Financing, Inc. ("Creditor") filed an objection to the Motion on the basis that the valuation of the collateral for its secured claim, Debtors' mobile home, was too low. Neither counsel for Debtor nor counsel for Creditor scheduled a hearing on the Motion, so on May 3, 2006, the Chapter 13 Trustee set the matter on the Court's calendar. An initial hearing was held on June 5, 2006.

MEMORANDUM DECISION REGARDING STANDARD
FOR VALUATION OF CREDITOR'S CLAIM

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

The hearing was continued to permit, <u>inter alia</u>, the parties to obtain appraisals and submit additional briefing. The Court held a final argument on the Motion on January 26, 2007, and took the matter under submission.

Debtors in this case are represented by James J. Gold, Esq. of Gold and Hammes. Craig C. Chiang, Esq. of Buchalter Nemer represents Creditor.

The Court now makes the following findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

I.

STATEMENT OF FACTS

Debtors purchased a 1998 Silvercrest W-69 mobile home on November 12, 1998, financing the purchase through Advantage Mobile Homes ("Advantage") with a loan in the sum of $109,502.00. When Debtors purchased the mobile home, it was already in its current location in a mobile home park in San Jose, California. Debtors make separate monthly payments to the owner of the mobile home park for rental of the space on which the mobile home sits.

The loan agreement ("Agreement") between Debtors and Advantage granted Advantage a security interest in the mobile home. Advantage assigned its interest in the Agreement to Creditor on the same day, November 12, 1998. The Agreement grants Creditor "a security interest under the Uniform Commercial Code in the commodity and all proceeds thereof and accessions thereto until [the Debtors] have paid the balance in full and completely satisfied all other requirements of this contract and any

MEMORANDUM DECISION REGARDING STANDARD
  FOR VALUATION OF CREDITOR'S CLAIM

modifications to it." The Agreement contains a section entitled
"Itemization of Amount Financed", which contains a list of items
and states that, "[i]f checked, the Total Cash Price includes the
following:". The list of items includes skirting and awnings.
However, none of the individual boxes is checked, and the entire
section is marked "N/A" to indicate that it does not apply. The
awnings and skirting are physically attached to the mobile home.
Also located on Debtors' space in the mobile home park are a
carport, shed and a patio. While the Agreement does not grant
Creditor a security interest therein, the awnings and skirting were
included in the mobile home purchase, according to Debtors. The
carport, shed and patio were not included in the purchase of the
mobile home, are not physically attached to the mobile home, and
are property of the park, not Debtors.[1] Creditor did not submit
any evidence to the contrary.

Debtors filed a chapter 13 petition, along with the Plan, on
July 30, 2004. The contract balance on the petition date was
$107,365.79. The Plan provided for monthly payments of $900 and a
dividend of 15% to general unsecured creditors. It did not list
Creditor's claim, and was confirmed on September 24, 2004. At the
time of confirmation, Debtors intended to make ongoing monthly
payments to Creditor at the contract rate of $1,003.90.

Debtors soon realized that they could not afford the monthly
outlays required by both the $900 monthly Plan payment and the
$1003.90 monthly payments to Creditor. Accordingly, Debtors filed
the instant Motion on October 5, 2005. Under the proposed
modification, Debtors sought to decrease Plan payments

---

[1] See October 26, 2006 Declaration of Casey Young.

retroactively to $366 per month for July through September 2005, which would then increase to $1,500 in October 2005 and continue at that level for the balance of the Plan term. The Motion also sought to pay Creditor's claim through the Plan, proposing to value the collateral at $40,000, with monthly payments of $400 and interest at 9.5% (which equals the contract interest rate). Debtors' proposed valuation is based on the NADA Manufactured Housing Appraisal Guide for the relevant period. The Motion also sought to decrease the dividend to general unsecured creditors to 1%.

Creditor opposed the Motion on the ground that the valuation of its collateral was too low. Creditor proposes to value the mobile home at $103,586, based on an appraisal of its "in-place" value by California licensed real estate appraiser Jim Moore.[2] In addition to the mobile home itself, the $103,586 appraisal includes and attributes separate value to the carport ($2,778), awnings ($2,045), patio ($2,919), shed ($903) and skirting ($2,240), based on the square footage of each. The appraisal also includes $26,800 based on the value of the park space.

The matter has now been fully briefed and argued, and was taken under submission by the Court on January 26, 2007.

II.

ANALYSIS

There are three possible methods for treatment of an allowed

---

[2] Creditor's appraisal asserts an "in-place" value for the mobile home, as of the petition date, of $103,586.00 and a value on a dealer lot of $76,786.00. See August 18, 2006 Declaration of Jim Moore.

secured claim such as the one held by Creditor under a chapter 13 plan: (1) the holder of the claim may accept the plan, (2) the debtor may surrender the collateral, or (3) the plan must comply with the chapter 13 cram down provisions. 11 U.S.C. § 1325(a)(5).[3] In this case, Debtors propose to retain the collateral and Creditor has objected to the proposed plan modification. Accordingly, the Plan, as modified, must satisfy the elements of cram down. Creditor retains the lien securing its claim, and the Plan must provide Creditor with payments, over the life of the Plan, that will total the present value of the allowed secured claim, i.e., the present value of the collateral. Associates Commercial Corp. v. Rash, 520 U.S. 953, 957 (1997). In this case, the Court must determine the proper method for valuing the collateral, i.e., the 1998 Silvercrest mobile home.

Section 506(a) provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest...is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property...and is an unsecured claim to the extent that the value of such creditor's interest...is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed distribution or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a).

It is undisputed that Creditor's interest in the estate's interest in the mobile home is defined by the Agreement. According to the Agreement, Creditor's security interest extends only to the mobile home itself. In addition, Debtors concede that the awnings

---

[3] Unless otherwise noted, all statutory references are to Title 11, United States Code (the Bankruptcy Code), as it existed when Debtors filed this bankruptcy petition on July 30, 2004.

and skirting were included in the purchase of the mobile home.[4] The terms of the Agreement do not grant Creditor a security interest in the carport, shed, or patio. Moreover, Debtors submitted a declaration stating that those items are property of the mobile home park and are not physically attached to the mobile home. Creditor did not submit any contrary evidence. In addition, the form of the Agreement specifically permits Creditor to claim a security interest in such items if appropriate, and it was not done in this case. Having determined the property that comprises Creditor's interest -- the 1998 Silvercrest mobile home -- the question in this case is how to value that interest for purposes of cram down.

Debtors contend that Rash supplies the standard for valuing Creditor's secured claim: "under § 506(a), the value of property retained because the debtor has exercised the § 1325(a)(5)(B) 'cram down' option is the cost the debtor would incur to obtain a like asset for the same 'proposed...use.'" Rash, 520 U.S. at 965. The standard set by Rash is the replacement value of the property, as distinguished from foreclosure value. Debtors contend that the replacement value of the mobile home can be found in the relevant NADA Manufactured Housing Appraisal Guide (which Debtors submitted into evidence), and is $40,000.

Creditor contends that the appropriate valuation of the mobile home is not the replacement value asserted by Debtors, but is instead the "in-place" value. In re Valdez, 338 B.R. 97 (Bankr. N.D. Cal. 2006). In Valdez, the bankruptcy court determined that

---

[4] Since Debtors do not contest this issue, the Court will treat the awnings and skirting as part of Creditor's collateral.

MEMORANDUM DECISION REGARDING STANDARD
FOR VALUATION OF CREDITOR'S CLAIM

6

the value of the collateral for purposes of fixing the amount of the secured creditor's claim under § 506 was the mobile home's in-place value. The bankruptcy court arrived at this conclusion by looking to the California state law rights of the legal owner of the mobile home, i.e., the secured creditor. Reasoning that, because state statutory law governing mobile home foreclosure gave the legal owner the right, in a foreclosure, to sell the mobile home in its present location within the mobile home park and to retain all proceeds from such a sale, the Valdez court held that the appropriate value of the secured creditor's claim under § 506 was the in-place value of the mobile home. The bankruptcy court stated that "[b]ecause this right arises by statute, it does not depend upon [secured creditor's] having a perfected security interest in any leasehold." 338 B.R. at 99. The court's decision did not address the Supreme Court's decision in Rash.

Citing the bankruptcy court's decision in Valdez, Creditor asserts that $103,586.00 is the value of its claim. Creditor contends that the in-place value of the collateral in this case, as of the petition date, was $103,586.00, which is set forth in Creditor's appraisal, conducted on July 10, 2006, and the accompanying declaration of appraiser Jim Moore.

The Court concludes that Rash controls the situation at bar. Rash mandates application of a replacement value standard for purposes of valuing a partially secured claim under § 506(a) where the debtor has exercised the cram down option under § 1325(a)(5).

In Rash, the secured creditor held a loan and lien on a tractor truck purchased by the debtors for use in a freight hauling business. The contract balance was $41,171. The debtors proposed

MEMORANDUM DECISION REGARDING STANDARD
FOR VALUATION OF CREDITOR'S CLAIM

7

to retain the collateral and invoked the cram down provision. The secured creditor objected to confirmation, sought to repossess the truck, and disputed the value assigned to the truck by the debtors. The secured creditor argued that the proper measure of valuation was the replacement value of the truck, estimated at $41,000. The debtors advocated application of the foreclosure value standard, estimated at $31,875. The bankruptcy court adopted the debtors' position and confirmed the plan. The district court and the Fifth Circuit affirmed. The Supreme Court reversed. Justice Ginsburg, writing for the majority, held that § 506(a) "directs application of the replacement-value standard." 520 U.S. at 956.

In a footnote, the Supreme Court explained the meaning of the term replacement value: "by replacement value, we mean the price a willing buyer in the debtor's trade, business or situation would pay a willing seller to obtain property of like age and condition." 520 U.S. at 959, n.2.

In deciding whether to apply foreclosure or replacement value, the Supreme Court stated that, under § 506(a), "the 'proposed disposition or use' of the collateral is of paramount importance to the valuation question." 520 U.S. at 962. Where a creditor objects to confirmation, the debtor has only two options for dealing with allowed secured claims: (1) surrender the collateral under § 1325(a)(5)(C) or (2) retain the collateral and exercise the cram down option under § 1325(a)(5)(B).

> The "disposition or use" of the collateral thus turns on the alternative the debtor chooses – in one case, the collateral will be surrendered to the creditor, and in the other, the collateral will be retained and used by the debtor. Applying a foreclosure-value standard when the cram down option is invoked gives no significance to the different consequences of the debtor's choice to surrender

> the property or retain it.  Employing a replacement value
> standard when the debtor retains the property, on the other
> hand, distinguishes retention from surrender and renders
> meaningful the key words "disposition or use."

520 U.S. at 962.

The Rash majority explicitly rejected the Fifth Circuit's reasoning that the replacement value standard was disrespectful of state law, under which the secured creditor could sell the collateral and obtain its net foreclosure value "and nothing more." 520 U.S. at 964, quoting 90 F.3d 1036, 1044 (1996).

> In allowing Chapter 13 debtors to retain and use collateral
> over the objection of secured creditors, however, the Code
> has reshaped debtor and creditor rights in marked departure
> from state law.  The Code's cram down option displaces a
> secured creditor's state-law right to obtain immediate
> foreclosure upon a debtor's default.  That change, ordered
> by federal law, is attended by a direction that courts look
> to the "proposed disposition or use" of the collateral in
> determining its value.  It no more disrupts state law to
> make "disposition or use" the guide for valuation than to
> authorize the rearrangement of rights the cram down power
> entails.

520 U.S. at 964 (citations omitted).

Creditor attempts to distinguish Rash on the ground that the case involved a truck, rather than a mobile home.  There is no support for such a position, other than Valdez, which, as noted above, does not discuss Rash.  It is well established that the holding of Rash applies to all manner of personal property, including mobile homes.  See, for example, In re Stratton, 248 B.R. 177 (Bankr. D. Mont. 2000)(mobile home); In re Mitchell, 320 B.R. 687 (Bankr. E.D. Mo. 2005)(car); In re Nice, 355 B.R. 554 (Bankr. N.D. W.Va. 2006)(SUV), In re Bivens, 317 B.R. 755 (Bankr. N.D. Ill. 2004)(van); In re Spraggins, 316 B.R. 317 (Bankr. E.D. Wis. 2004)(computer and television); In re Nguyen, 2006 WL 2846822

(Bankr. W.D. La. Mar. 21, 2006)(shrimp boat).

It is not possible to discern whether or not Valdez implicitly takes account of the Supreme Court's holding. It is, however, difficult to apprehend how Valdez can be construed consistently with the replacement value standard set by Rash. Extension of Valdez's logic to other personal property is illustrative. Take, for instance, a partially secured automobile loan. Where the debtor elects the cram down option and the creditor objects, under Valdez, the creditor's rights would be defined by state law. Under California law, a creditor holding a security interest in an automobile may repossess the collateral and sell it at auction -- just as the legal owner of a mobile home may do. The fundamental difference between the two situations is that, with respect to automobiles, the replacement value, often defined by the Kelley Blue Book, is substantially higher than what the creditor would obtain at a hypothetical foreclosure sale. Unlike a mobile home, an automobile that is sold at auction receives no premium based on its location. If Valdez is applied to a partially-secured automobile loan, where the debtor elects to retain the collateral, the creditor would only be entitled to be paid the amount it would be able to obtain if it exercised its state law foreclosure rights, which is, generally speaking, significantly lower than the replacement value. Not only would such a situation be highly objectionable from the perspective of secured auto lenders, it is not the law. Where a debtor elects the cram down option with respect to an automobile, the debtor must pay the secured creditor the replacement value of the vehicle. Rash, 520 U.S. at 963; In re Schwalb, 347 B.R. 726, 758 (Bankr. D. Nev. 2006). In this Court's

opinion, the same is true when the collateral involved is a mobile home. See <u>Stratton</u>, 248 B.R. at 182. This conclusion is not altered by the fact that, in this particular case, the foreclosure value of the mobile home happens to be greater than the replacement value.

Creditor argues that, when determining Creditor's interest in the collateral, the Court must evaluate the "in-place" interest. This appears to be an attempt by Creditor to divorce the issue from the question of the appropriate method for valuation -- which, according to <u>Rash</u>, is replacement value. Instead, Creditor attempts to frame the issue as requiring a determination of (1) Creditor's interest that is being valued; and (2) how to value that interest. Creditor contends that the answer to the first question, pursuant to <u>Valdez</u>, is that the interest to be valued is the mobile home in-place in the mobile home park, and it therefore follows that, under state law, a creditor could foreclose and sell the property in its present location. The logic of this position is circular. The reason <u>why</u> Creditor believes its interest is the "in-place" interest relates to state foreclosure law, to which the <u>Valdez</u> court looked to determine the appropriate method of valuation. Logically, under Creditor's analysis, there would be no need to analyze separately the value of Creditor's interest, because Creditor's answer to the first part of the inquiry supplies the same answer to the second valuation question in every instance -- <u>i.e.</u>, if the proposition that Creditor's interest is the "in-place" interest is accepted, then the value, by definition, is the foreclosure value under state law. In this Court's opinion, this analysis is purely obfuscatory, and is incorrect for a number of

reasons, the most significant being that it is directly contrary to the replacement value standard set by the Supreme Court in Rash.

In reality, there is no dispute over the answer to the first question posed by Creditor -- Creditor's interest is defined by the Agreement and state law. The answer to the second question -- the valuation question -- however, is not defined solely by state law. If it were, the appropriate standard may be foreclosure value, as stated in Valdez. The Supreme Court has, however, explicitly rejected this position (which was, in fact, urged by the debtors in the Rash case) by defining the valuation question not in terms of state law, but rather in terms of bankruptcy law under § 506 and in light of the proposed use or disposition of the collateral. As the Supreme Court held, application of the replacement value standard, rather than foreclosure value, properly accounts for the debtor's continued use of the collateral. Rash, 520 U.S. at 962. The replacement value standard values "the creditor's interest in the collateral in light of the proposed [repayment plan] reality: no foreclosure sale and economic benefit for the debtor derived from the collateral equal to ... its [replacement] value." Id., quoting In re Winthrop Old Farm Nurseries, Inc., 50 F.3d 72, 75 (1st Cir. 1995). In this case, Debtors propose to retain and use the collateral in the same manner as was contemplated when it was originally purchased and as such property is customarily used -- as a place of residence.

Creditor argues that Debtors misinterpret Rash and its replacement value mandate and suggests that, because Debtors have elected to continue using the collateral they must pay Creditor $103,586. Creditor has no explanation for its contention that,

because Debtors propose to retain the collateral, they must pay the foreclosure value ascribed to it by Creditor. Creditor has been unable to explain how its proposed valuation represents anything but foreclosure value -- the standard that was explicitly rejected by Rash. Creditor has not made an argument that its $103,586 valuation represents an estimate of replacement value, and any such argument would be incorrect in any event.

Despite its attempts to distinguish Rash, Creditor asserts that Rash actually supports its position because "if Debtors choose not to surrender the Mobilehome to [Creditor], they must pay [Creditor] more than the foreclosure value of the Mobilehome. To take into account the additional risk that Debtors may default, [Creditor] is allowed a secured claim for the higher, fair market value of the Mobilehome." Creditor's Supplemental Brief at 7:26 - 8:2. Creditor's position is that, where Debtors propose to retain the collateral over Creditor's objection, Creditor must be paid more than the foreclosure value. But Rash merely mandates application of replacement value without any reference to whether that value is higher or lower than the foreclosure value.[5] It is true that under the facts of Rash, the replacement value was higher than the foreclosure value. But it is not true that where the situation is reversed -- as it is in this case -- that the creditor is entitled to select the higher of the two. Replacement value is the standard set by the Supreme Court and this Court is bound to follow it, whether or not, in a particular case, it is higher or lower than

---

[5] In this case, Debtors' proposed modified plan also proposes to pay Creditor the contract rate of interest, and Creditor does not argue that it is entitled to a higher rate.

MEMORANDUM DECISION REGARDING STANDARD
FOR VALUATION OF CREDITOR'S CLAIM

13

the foreclosure value.

State foreclosure law has a specific purpose, which is to allow the creditor to sell the collateral in a very short period of time and recover as much money as possible. State law with respect to mobile homes, cited in Valdez and urged by Creditor, makes a great deal of sense in that context. In a foreclosure, the debtor loses the property. In that situation, allowing the foreclosing creditor to reap the benefit of the mobile home's in-place value has no negative effect on the debtor and provides a potentially enormous benefit to the creditor. That policy is, however, substantially at odds with the Bankruptcy Code, where, as here, Debtors' intention is to keep the property. The purpose of the cram down provision is to permit Debtors to retain the property by paying Creditor its value. Till v. SCS Credit Corp., 541 U.S. 465, 476 (2004). Under such circumstances, it makes no sense to include in the valuation of the collateral items that the creditor did not provide and in which it has no security interest. The Bankruptcy Code alters debtor and creditor rights "in marked departure from state law," by "displac[ing] a secured creditor's state-law right to obtain immediate foreclosure upon a debtor's default." Rash, 520 U.S. at 964. This reshaping of parties' rights by the Bankruptcy Code will benefit debtors in some instances (specifically where, as here, the foreclosure value of the collateral is higher than the replacement value), and creditors in others (where the situation is reversed). Even application of the law is essential.

The fact that foreclosure value in this case is significantly higher than replacement value is largely a reflection of the current state of the California real estate market. Mobile home

spaces are scarce in this area. That scarcity, and the particulars of the location (neighborhood safety, quality of schools, etc.), contribute significantly to the foreclosure value. See October 26, 2005 Declaration of Patty Lambert, ¶7; see also July 28, 2006 appraisal report, attributing a value of $26,800 to the park space. In this case, Creditor is not secured to any extent by Debtors' leasehold interest in the mobile home space, yet Creditor insists that, in order to retain the mobile home, Debtors must pay Creditor an additional $26,800 for the value of the park space. Review of the Agreement shows that the form is drafted to permit Creditor to take a security interest in the mobile home park tenancy, if desired. This was not done in the instant case. Debtors already possess a mobile home space inside the park, which is provided by the park owner and for which they make separate payments. Those separate payments to the park landlord presumably reflect the full value of the location. It would be inequitable, therefore, to require Debtors -- as a condition of retaining their home -- also to pay Creditor for the portion of value that the mobile home park tenancy contributes to the value asserted by Creditor. The same is true of the carport, shed and patio. In a foreclosure situation, Creditor could reap the benefit of the value added to the mobile home by these items. The evidence is clear, however, that Creditor has no security interest in these items. They are property of the mobile home park, and presumably some portion of the monthly space rent is also attributable to their value. To the extent that Creditor now contends under Valdez that it should be paid for these items because it would receive value for them under state foreclosure law, despite its lack of a security interest therein,

the Court rejects this argument as both unfair and contrary to the Bankruptcy Code, for the same reasons set forth above.

### III.

### CONCLUSION

The Court concludes that the appropriate standard for valuing Creditor's claim in this case is replacement value as set forth in Rash. The parties agree that the proper date for valuation is the petition date, July 30, 2004. The Court finds that Creditor's security interest includes the skirting and awnings, which were acquired as part of Debtors' purchase of the mobile home. The Court finds that Creditor's interest does not extend to the carport, shed or patio, which are not property of Debtors, and belong to the mobile home park. The calculation of the replacement value does not include the mobile home's in-place value and may not attribute any value to the carport, shed or patio, in which Creditor has no interest.

In order to determine whether the Plan can be modified as Debtors propose, the actual value of Creditor's claim must be set. The parties have submitted different estimates of the replacement value of Debtors' mobile home. This may be resolved by stipulation, or the parties may contact the Court to schedule an evidentiary hearing to determine the replacement value.

Dated: April 17, 2007

ARTHUR S. WEISSBRODT
UNITED STATES BANKRUPTCY JUDGE

MEMORANDUM DECISION REGARDING STANDARD
FOR VALUATION OF CREDITOR'S CLAIM

16

Case: 04-54764   Doc# 48   Filed: 04/17/07   Entered: 04/17/07 14:13:02   Page 16 of 17

Court Service List

Casey Young
5450 Monterey Rd. #1A
San Jose, CA 95111

Norma L. Hammes, Esq.
Law Offices of Gold and Hammes
1570 The Alameda #223
San Jose, CA 95126

Barbara Faye Young
5450 Monterey Rd. #1A
San Jose, CA 95111

Mark M. Scott, Esq.
Craig C. Chiang, Esq.
Buchalter Nemer
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514

Devin Derham-Burk
P.O. Box 50013
San Jose, CA 95150-0013

Eva Alexandra Delateur
Office of the Chapter 13 Trustee
P.O. Box 50013
San Jose, CA 95150

U.S. Trustee
Office of the U.S. Trustee
U.S. Federal Bldg.
280 S 1st St. #268
San Jose, CA 95113-3004